**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CAROL ANN SWARROW,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **2:13-cv-01060** |
| | ) |
| **CAROLYN W. COLVIN**, | ) |
| ACTING COMMISSIONER OF | ) |
| SOCIAL SECURITY**,** | ) |
| **Defendant.** | ) |

**MEMORANDUM OPINION AND ORDER**

July 14th, 2014

**I.      Introduction**

Plaintiff, Carol Ann Swarrow, brought this action pursuant to 42 U.S.C. §§ 405(g) and

1383 (c)(3) for judicial review of the final determination of the Commissioner of Social Security

("Commissioner") which denied her application for disability insurance benefits ("DIB") and

supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act"),

42 U.S.C. §§ 401-403, 1381-1383(f). The parties have filed cross-motions for summary

judgment (ECF Nos. 11, 13). The record has been thoroughly developed at the administrative

level. (ECF No. 9). Accordingly, the motions are ripe for disposition. For the following reasons,

the Commissioner's motion will be **GRANTED**, and Plaintiff's motion will be **DENIED**.

**II.     Background**

**A.      Procedural History**

Plaintiff protectively filed applications for DIB and SSI on July 22, 2009, in which she

claimed total disability as of April 14, 2005. An administrative hearing was held on July 11,

2011, before Administrative Law Judge ("ALJ") Leslie Perry-Dowdell. Plaintiff was represented

by counsel and testified at the hearing. Dr. Cohen, an impartial vocational expert ("VE"), also

1

testified at the hearing.

On October 14, 2011, the ALJ rendered an unfavorable decision to Plaintiff, in which she found that Plaintiff retained the ability to perform sedentary work with the following additional limitations:

> The claimant is limited to simple, routine, repetitive tasks that do not require fast-paced production requirements. The claimant can make simple work related decisions and adapt to routine work place changes but must be isolated from the public and have only occasional supervision and contact with co-workers. The claimant needs to alternate sitting and standing and perform jobs that can be done while using a hand held device (only used for ambulating and not just standing in place). The claimant can occasionally climb stairs, ramps and ladders but not ropes or scaffolds. In addition, the claimant can perform occasional kneeling and crawling and frequent balancing, stooping and crouching.

(R. 24). The VE testified that given all of these factors, Plaintiff would still be able to perform the requirements of the following representative occupations: surveillance system monitor (50,000 jobs nationally), inspector (50,000 jobs nationally), or packer with a sit/stand option (75,000 jobs nationally). (R. 28). Accordingly, the ALJ held that Plaintiff was not "disabled" within the meaning of the Act and denied her claims for benefits. (R. 28-29).

The ALJ's decision became the final decision of the Commissioner on May 29, 2013, when the Appeals Council denied Plaintiff's request to review the decision of the ALJ. On July 29, 2013, Plaintiff filed a Complaint in this Court seeking judicial review of the ALJ's decision. On November 12, 2013, these cross-motions for summary judgment followed.

**B.     Facts**

Plaintiff was born on June 20, 1965. She has a twelfth-grade education and previously worked as a nurse's aide and as a laborer at a metal factory. She alleges disability as of April 14, 2005, primarily due to a cracked lumbar bone from a car accident and malignant tumors in her throat. Although she worked during the relevant period, the ALJ found that she has not engaged

in substantial gainful activity since her alleged onset date. (R. 22).

## 1. Medical Evidence

Plaintiff's claim of disability was precipitated by injuries she sustained on April 14, 2005, when she was pushed out of a vehicle by her boyfriend and then hit by the vehicle.[1] Although she did not lose consciousness, she sustained a closed head injury, a cracked lumbar spine, and other minor injuries. (R. 237-38). Plaintiff's blood alcohol content at the time of the accident was .202. (R. 237-38). An MRI showed minimal degenerative changes and a mass on the right side of the neck. (R. 251). Plaintiff was hospitalized for two days following this incident, and although she appeared in a depressed mood, she was cooperative and pleasant with no suicidal or homicidal ideation, no hallucinations, and fair judgment. (R. 239). She was assigned a global assessment of functioning score ("GAF") of 55. (R. 239).

Several months later, Plaintiff underwent a thyroid ultrasound, which revealed an enlarged left thyroid lobe with a lesion. (R. 323). A thyroid scan was ordered, but Plaintiff never followed through with it. (R. 516).

On December 6, 2005, Plaintiff saw Dr. John Martin, her primary care physician, for a check-up. (R. 516). Plaintiff reported having pain in her right ear following the accident, for which she had been prescribed antibiotics. (R. 516). She made a number of other complaints, as well, including back pain and fibromyalgia. (R. 516). Upon examination, Dr. Martin found that Plaintiff was not in acute distress, but reported finding tenderness in her lower back. (R. 516-17). Dr. Martin diagnosed her with possible otitis externa, which is an inflammation of the outer ear or ear canal. (R. 517). He further noted that he was going to refer Plaintiff back to Dr. John Lee,

---

1. There are two pieces of evidence in the record that precede the alleged onset date. Plaintiff apparently tested positive for hepatitis C in 1992. Additionally, in 2001, testing revealed moderate to moderately severe hearing loss in Plaintiff's right ear. (R. 831).

whom she had been seeing for back pain, and advised her to stop smoking, since that aggravated her back problem. (R. 517).

On December 15, Plaintiff was seen by Dr. Vasu Malepati, upon referral from Dr. Martin. (R. 502). Plaintiff reported that her right ear felt blocked, with pain radiating down her neck and associated hearing loss. (R. 502). Upon examination, Dr. Malepati noted a right thyroid mass and advised her to continue medicating with antibiotics. (R. 502). Dr. Malepati also advised Plaintiff to undergo an otologic exam and thyroid evaluation. (R. 502). In January, Plaintiff underwent an ultrasound, the results of which reflected a large cold nodule on Plaintiff's left thyroid lobe. (R. 322). It could not be determined whether the nodule was malignant, however. (R. 322).

Dr. Lee again examined Plaintiff after she complained of back pain in December 2005. He reported that she had a limping gait, but found active reflexes, and generally no definite focal, motor, or sensory deficits. (R. 510-11). Therefore Dr. Lee recommended intensive home exercise coupled with hot showers and hydrotherapy. (R. 212).

Plaintiff followed up with Dr. Malepati regarding her thyroid mass on January 5, 2006. (R. 501). At this point, she had not yet undergone a thyroid scan. (R. 501). Dr. Malepati told her to return after such a scan was completed, noting that if the scan revealed a cold nodule, Plaintiff might need a thyroidectomy. (R. 501). Dr. Malepati also noted that Plaintiff's otitis eternal had healed well. (R. 501).

In February 2006, Plaintiff was admitted to Washington Hospital for chest pain, shortness of breath, and sweating. (R. 762). Before having been admitted, Plaintiff disclosed that she drank six beers that day. (R. 764). Plaintiff also reported to Dr. Howard Goldberg that she had failed to follow up with her doctors regarding the thyroid growths. (R. 226). Test results from Plaintiff's

inpatient stay were unremarkable, and she denied suicidal and homicidal ideation. (R. 786, 801). After three days, Plaintiff was discharged, at which time she reported her pain as three out of ten. (R. 766).

In April 2006, Plaintiff followed up with Dr. Malepati, complaining of trouble breathing, pressure and sensation on the left side of her throat, and hoarseness. (R. 320). Dr. Malepati advised her to have a left hemi-thyroidectomy and a flexible laryngoscopy exam. (R. 499).

Plaintiff next saw Dr. Malepati on June 28, 2007, at which time she complained of a sore throat and difficulty swallowing. (R. 498). Following his examination, Dr. Malepati noted that Plaintiff's pharynx was red. (R. 498). He gave her a saline gargle and a Z-pack and again advised her to undergo a hemi-thyroidectomy if the symptoms persisted. (R. 498).

In December 2007, Plaintiff was admitted to Washington Hospital after she was punched by her ex-boyfriend. (R. 746). Plaintiff was depressed and displayed rib tenderness. (R. 748-49). X-rays revealed rib fractures. (R. 749). Plaintiff was prescribed pain medication and released. (R. 749, 756-58).

More than a year later, in April 2008, Plaintiff returned to Washington Hospital, after having taken an extra prescription Xanax. (R. 725). She also admitted to having consumed beers. (R. 725). She refused any drug or alcohol treatment and was released after denying suicidal or homicidal ideation and was released later the same day. (R. 732, 740-41).

One month later, Plaintiff returned to Washington Hospital. She reported having used alcohol and verbalized suicidal ideation in the emergency room. (R. 704). Plaintiff claimed to have attempted to harm herself, and had superficial lacerations on her arms as a result. (R. 704). However, she was sober the next day and discharged after again denying any suicidal or homicidal ideation. (R. 707, 713).

In April of 2009, Dr. Oscar Urea completed an Employability Assessment form for the Pennsylvania Department of Welfare, in which he indicated that Plaintiff was temporarily disabled from April 2, 2009, through July 31, 2009. Dr. Urea listed mood disorder, not otherwise specified, and alcohol dependence as the causes of Plaintiff's disability. (R. 264-65).

The next month, Plaintiff saw Dr. Goldberg. (R. 280). She reported feeling hoarse and experiencing neck pain, which "comes and goes." (R. 280). She also noted feeling fatigued. (R. 280). Dr. Goldberg assessed Plaintiff with a thyroid nodule of several years duration. (R. 283). He noted that she did not display any stigmata or hyper-or-hypo-thyroidism at the time, but she did have mild compressive symptoms. (R. 283). To further assess Plaintiff's condition, Dr. Goldberg ordered another ultrasound, after which he would schedule an ultrasound-guided fine needle aspiration of the lesion to determine if it was cancerous. (R. 284). The results of the ultrasound showed a large hypoechoic nodule in her left thyroid and a right thyroid lobe that was asymmetrically longer than the left. (R. 677). Based upon this visit, Dr. Goldberg completed a medical source statement regarding Plaintiff's claim and found that she had no limitations in lifting, carrying, standing and walking, sitting, pushing and pulling, or engaging in postural activities or other physical functions. (R. 278-79).

The following week, Plaintiff visited the hospital two days in a row reporting symptoms such as headache, diarrhea, and throat drainage. (R. 698). The first day Plaintiff left without being seen, and the second day was observed outside smoking three times before being discharged after declaring, "I need to go." (R. 683).

Plaintiff was seen at Monongahela Valley Hospital for neck pain and mild swelling in June 2009. At that time, her overall condition was described as "good," and the report notes that Plaintiff denied any psychiatric symptoms. (R. 301). Later that month, she returned to

Monongahela Valley Hospital with complaints of abdominal pain, nausea, and vomiting. (R. 289). She again denied any psychiatric symptoms. (R. 289). A CT scan showed fatty infiltration of the liver and fecal matter throughout Plaintiff's colon, but a chest X-ray was unremarkable. (R. 298-99). Plaintiff was given a prescription after she returned to Monongahela Valley Hospital complaining of abdominal pain, nausea, and vomiting. (R. 292).

Dr. Malepati completed an Employment Assessment Form for Plaintiff in July 2009, which stated that she was temporarily disabled from July 10, 2009, to July 10, 2010, due to her thyroid mass. (R. 327).

In July 2009, Plaintiff was referred to Dr. Robert Ferris in connection with her thyroid disorder. (R. 330). Dr. Ferris noted that even though Plaintiff had known about her left thyroid mass for three years and had previously been advised to have it removed, but she had just now indicated her willingness to go forward. (R. 330). Dr. Ferris performed an ultrasound-guided fine needle aspiration biopsy, which led him to suspect that Plaintiff had a large parathyroid adenoma (or tumor). (R. 330-32, 430).

In September 2009, Plaintiff was seen at Washington Hospital for prescription drug overdose combined with alcohol use, but denied any homicidal or suicidal ideation. (R. 651, 654, 662). Two weeks later, Plaintiff was readmitted to Washington Hospital with back pain which she rated as ten out of ten. (R. 632). She appeared depressed, but her gait appeared normal and she was discharged that day. (R. 634-36). That same week Plaintiff returned to Washington Hospital after being assaulted by her ex-boyfriend. (R. 626). She rated her pain eight out of ten and was found able to perform activities of daily living. (R. 626).

In October 2009, Dr. Ferris performed a left thyroid lobectomy and prescribed antibiotics for Plaintiff. (R. 352). Two days after the surgery, Dr. Kavita Kuchipudi found the incision from

the surgery was healing well. (R. 336). At that time, Plaintiff denied any psychiatric symptoms. (R. 337).

A week later, Dr. Ferris reported that pathologic examination following the last procedure confirmed the presence of a variety of papillary thyroid carcinoma in Plaintiff's left lobe, along with inflammation which was caused by her surgery. (R. 365). Dr. Ferris scheduled Plaintiff for a completion right thyroid lobectomy, followed by radioactive iodine therapy, which was performed on November 24, 2009. (R. 358). When he discharged Plaintiff the next day, Dr. Ferris instructed her not to lift more than 10 pounds. (R. 402).

On December 22, 2009, Plaintiff saw Dr. Jill Sharer for a follow up to her thyroidectomy and for right knee pain. (R. 419-21). Dr. Sharer reported finding no edema or erythema in the right knee, but did report noticing popping sounds. (R. 419). Plaintiff was assessed with thyroid cancer and joint disease. (R. 471).

In January of 2010, Dr. Sharer again followed up on the thyroidectomy. (R. 469). At the time, Plaintiff complained of head congestion and ear pain. (R. 469). Plaintiff was diagnosed with pharyngitis, a swelling of the throat. (R. 471). At this point Plaintiff weighed 205 pounds, up from the 165 pounds she weighed on July 30, 2009. (R. 422, 439).

Shortly after her visit with Dr. Sharer, Plaintiff saw John Gibbons, M.D., for right knee pain. Plaintiff was walking with a stiff gait, and the doctor's impression was early osteoarthritis and a possible degenerative meniscus tear. (R. 472-73). As a result, Gibbons administered a shot of cortisone to the knee. (R. 473).

In March 2010, Plaintiff underwent an MRI that revealed arthritis and several partial ligament tears in her right knee. (R. 525). Plaintiff was still experiencing severe pain, so Dr. Gibbons administered another injection to the knee. (R. 525).

Plaintiff underwent another MRI in May 2010. (R. 537). The results showed a variety of damage to the right knee, including joint effusion, and a large cyst. (R. 537). The MRI results also showed mild inflammation, some healing of the partial tears of the MCL, degeneration, and mild degenerative changes. (R. 537).

Dr. Sharer examined Plaintiff later that month and found her right knee had extension issues and effusion. (R. 822). Plaintiff was also noted to be walking with a limp. (R. 822). After reviewing the results of an MRI, which revealed a lateral meniscus tear, Dr. Gibbons recommended that Plaintiff undergo an arthroscopic lateral meniscectomy on her right knee. (R. 521, 524).

A month later, Dr. Sharer examined Plaintiff and found she was still using crutches, but was now drinking in moderation. (R. 818). Dr. Sharer filled out another Employment Reassessment Form and checked the box for "permanently disabled." (R. 521). Dr. Sharer noted restrictions in daily activity, but not in Plaintiff's social functioning. (R. 530).

In August 2010, Plaintiff was told that she could walk without crutches. (R. 523). Her right knee incisions were healing well, and although there was moderate swelling, the knee could fully extend. (R. 523). That month, Dr. Sharer completed medical source statements, in which she listed Plaintiff's symptoms as difficult ambulation and joint pain, with a history of thyroid cancer and knee arthrosis. (R. 527-30). Dr. Sharer listed Plaintiff's work capacity as "None," and said she could lift only ten pounds. (R. 527). Moreover, Dr. Sharer described Plaintiff's pain as moderate to severe. She also stated that Plaintiff could not engage in any work-related postural activities, and that she had a marked restriction of her daily activity. (R. 527-30).

Dr. Goldberg reexamined Plaintiff in September 2010 and found the incision from her surgery had healed well. (R. 532-33). Moreover, she exhibited no evidence of thyroid disease.

(R. 532-33). At the same time, Plaintiff began four weeks of physical therapy for her right knee. (R. 540). She reported her pain was five out of ten, and her medical records demonstrate she had a good tolerance for the treatment. (R. 540). Dr. Gibbons reported some progress in the physical therapy; that the right knee was showing good tolerance for the treatment; that it had good extension; and that overall Plaintiff seemed to be getting better with therapy and was "walking pretty well." (R. 830). Two months later, Dr. Gibbons reported that Plaintiff was walking without a limp. (R. 829). In January 2011, Dr. Sharer found that Plaintiff's back was normal, with no abdominal tenderness. (R. 812-14).

The record ends with Dr. Gibbon's examination of Plaintiff in March 2011. (R. 828-47). Dr. Gibbons found tenderness, moderate degenerative changes, and pain from arthritis in Plaintiff's right knee. (R. 828). However, he found her motor and sensation functions were intact and that she could rotate her hip without discomfort. (R. 828). An MRI analyzed at the same time revealed mild stenosis and degenerative disc disease in the Plaintiff's back. (R. 834-37). Dr. Gibbons noted it was not a normal MRI, but that it "was not overly impressive," and that Planitiff's back "does not look too bad." (R. 847). Plaintiff was given an epidural shot to address her complaint of pain. (R. 847).

## 2. Hearing Testimony

Plaintiff testified that she had to quit working because the pain became too unbearable for her to be on her feet. (R. 41). She testified that she could only stand for a period of 10 minutes before having to sit down, and then she could only sit for about 5 minutes before having to stand up again. (R. 41). According to Plaintiff, the pain was in her hands, back, legs, feet, and right knee. (R. 41-45). She also described feeling numbness in her hands. (R. 42). She testified that she had been walking with a cane for about a year, as prescribed by Dr. Gibbons. (R. 44).

Plaintiff also testified that she was on pain medication. (R. 45).

When asked if there was anything else that limited her ability to do things, Plaintiff testified that "[a] lot of times if my thyroid level is off, they call it, it's just where you level is off, you feel like you're under water. You can't concentrate." (R. 43-44). She testified that she had her thyroid tested every three to four weeks. (R. 44). When asked if the tumor in her neck was limiting her ability to do things, Plaintiff replied, "No." (R. 44). The ALJ specifically asked Plaintiff if there was anything else which limited her ability to do things, but she spoke only of those three impairments. (R. 43).

On examination from her attorney, Plaintiff testified that she has not had a driver's license since 2002 because of pain. (R. 46). Plaintiff's attorney also prompted her to testify about psychological issues, which she described as anxiety, forgetfulness, and depression. (R. 47.) The symptoms of her depression were crying and a lack of energy. (R. 47). She also responded to her attorney that she had side effects of fatigue from her medication. (R. 48). Plaintiff testified that she likes to be alone, but that she has no other psychological conditions. (R. 50-51).

At the conclusion of counsel's examination of Plaintiff, she asked that the record stay open for additional records, and the ALJ agreed it would remain open for ten days. (R. 51).

At the conclusion of the hearing, Plaintiff's counsel requested that the ALJ consider whether Plaintiff met or equal the thyroid cancer Listing. (R. 57). She also requested that the ALJ consider ordering a consultative examination. (R. 57). The ALJ agreed to consider "all of that" and also kept the record open for 10 days to permit Plaintiff's counsel to submit any additional medical evidence. (R. 57).

## III.    Legal Analysis

### A.    Standard of Review

The Act limits judicial review of disability claims to the Commissioner's final decision. 42 U.S.C. §§ 405(g), 1383(c)(3). If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed by the Court. 42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). The United States Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 400 (1971) (citation omitted). It consists of more than a scintilla of evidence, but less than a preponderance. *Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 798, 800 (3d Cir. 2010) (citation omitted).

When a claimant files concurrent applications for SSI and DIB, courts have consistently addressed the issue of a claimant's disability in terms of meeting a single disability standard under the Act. *See Sullivan v. Zebley*, 493 U.S. 521, 525 n.3 (1990) (holding that regulations implementing the Title II [DBI] standard, and those implementing the Title XVI [SSI] standard are the same in all relevant aspects.); *Burns v. Barnhart*, 312 F.3d 113, 119 n.1 (3d Cir. 2002) (citing 20 C.F.R. § 416.920 *with* § 404.1520) ("This test [whether a person is disabled for purposes of qualifying for SSI] is the same as that for determining whether a person is disabled for purposes of receiving social security disability benefits [DIB]."); *Morales v. Apfel*, 225 F.3d 310, 315-16 (3d Cir. 2000) (stating that a claimant's burden of proving disability is the same for both DIB and SSI).

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is

working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work. *See* 42 U.S.C . § 404.1520; *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545-46 (3d Cir. 2003) (quoting *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118-19 (3d Cir. 2000)).

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Fargnoli v. Massanari*, 247 F.3d 34, 38-39 (3d Cir. 2001) (citation omitted); 42 U.S.C. § 423 (d)(1) (1982). This may be done in two ways: (1) by introducing medical evidence that the claimant is disabled *per* se because he or she suffers from one or more of a number of serious impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1, *see Heckler v. Campbell*, 461 U.S. 458 (1983); *Newell*, 347 F.3d at 545-46; *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004); or, (2) in the event that claimant suffers from a less severe impairment, by demonstrating that he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes plaintiff from returning to his or her former job. *Newell*, 347 F.3d at 545-46; *Jones*, 364 F.3d at 503. Once it is shown that claimant is unable to resume his or her previous employment, the burden shifts to the Commissioner to prove that, given claimant's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Rutherford*, 399 F.3d at 551; *Newell*, 347 F.3d at 546; *Jones*, 364 F.3d at 503;

*Burns*, 312 F.3d at 119.

Where a claimant has multiple impairments which may not individually reach the level of severity necessary to qualify for Listed Impairment status, the Commissioner nevertheless must consider all of the impairments in combination to determine whether, collectively, they meet or equal the severity of a Listed Impairment. *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 502 (3d Cir. 2009); 42 U.S.C. § 423(d)(2)(C) ("in determining an individual's eligibility for benefits, the Secretary shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity").

**B.      Discussion**

As set forth in the Act and applicable case law, this Court may not undertake a de novo review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Med. Cntr. v. Heckler*, 806 F.2d 1185, 1190 (3rd Cir. 1986), *cert. denied.*, 482 U.S. 905 (1987). The Court must simply review the findings and conclusions of the ALJ to determine whether they are supported by substantial evidence. 42 U.S.C. § 405(g); *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). Plaintiff raises six arguments in support of her motion, which will be discussed *seriatim*.

1.      *The ALJ Did Not Err at Step 3 of the Sequential Evaluation.*

Plaintiff contends that the ALJ erred by failing to consider whether Plaintiff met or equaled the following Listings at step 3 of the sequential evaluation: 1.04A (nerve and spinal disorders), 1.08 (soft tissue injuries), 12.02 (organic mental disorders), and 13.09 (malignant neoplastic diseases). The Court finds Plaintiff's argument to be without merit.

At Step 3 of the sequential evaluation, the ALJ must determine whether a claimant's impairment or impairments meet or equal any of the listed impairments. *Burnett*, 220 F.3d at 119

(citation omitted). The ALJ must, in turn, "adequately explain" why a claimant's impairment(s) do or do not satisfy the requirements of the Listings. *Arroyo v. Comm'r of Soc. Sec.*, 155 F. App'x 605, 607 (3d Cir. 2005). In *Burnett*, the Court of Appeals "held that the ALJ's bare conclusory statement that an impairment did not match, or is not equivalent to, a listed impairment [is] insufficient" to satisfy this requirement. *Jones*, 364 F.3d at 504 (citing *Burnett*, 220 F.3d 119-20). However, the Court of Appeals has since made clear that "*Burnett* does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." *Id.* Rather, the primary purpose of this requirement is to guarantee that the reasons for the ALJ's decision are set forth clearly enough to enable "meaningful review" by the district court. *Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004). Thus, ALJs are encouraged "to specifically identify the listed impairments under consideration," so long as the district court is "able to discern the particular listed impairments considered . . . based on the ALJ's discussion of the relevant evidence and his related conclusion," remand is not required. *Arroyo,* 155 F. App'x at 608.

The ALJ's explanation meets that standard. Although she did not specifically identify or cite the listed impairments under consideration, it is clear from her discussion that she had considered the requirements of the Listings cited by Plaintiff's counsel in relation to the evidence presented. First, although the ALJ did not cite Listing 13.09, she discussed Plaintiff's thyroid cancer and noted that although she allegedly experiences hoarseness and hypothyroidism, she is in Stage I, has not had any lymph nodes removed, and the cancer has not been described as invasive. Additionally, the ALJ specifically noted that physical examinations and testing had been normal since her treatment began. (R. 23). Then the ALJ described Plaintiff's knee issues, but dismissed them because her gait, strength and range of motion are normal. (R. 23). From

there, she moved on to discuss Plaintiff's closed head injury and complaints of numbness, but concluded that these issues have been resolved. (R. 23). Finally, the ALJ discussed Plaintiff's low back pain and determined that because she had a normal gait, strength, and sensation – and the fact that she was not undergoing treatment – such condition did not reach listing-level severity. The ALJ also considered whether Plaintiff's mental conditions met or equaled the severity of any of the Listed Impairments in § 12.00, but determined that neither the Paragraph B or C criteria were satisfied. Accordingly, based on the ALJ's thorough discussion of the alleged impairments, it is clear to the Court the listings which she was discussing and the basis upon which she determined that Plaintiff did not satisfy any of the Listings. Substantial evidence supports that decision.[2]

> 2. *The ALJ Did Not Err in Having Failed to Obtain an Expert Opinion or Ordering a Consultative Examination.*

Plaintiff next contends the ALJ erred by having failed to address her request for additional testimony from a Medical Expert to have determined whether Plaintiff met or equaled any of the Listings and her motions for a psychological and/or psychiatric consultative examination. The Court is unpersuaded by these contentions.

---

2.      Plaintiff relies on four cases in support of her argument, all of which are distinguishable. In *Burnett,* for example, the ALJ's decision contained only the bare conclusion that the claimant's impairment "failed to equal the level of severity of any disabling condition contained in Appendix 1, Subpart P of Social Security Regulations 4." *Burnett*, 220 F.3d at 119. The ALJ's decision in the instant matter far exceeds that statement in terms of its clarity and depth of analysis. The ALJ's decision in another case on which Plaintiff relies, *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996) was remanded for the same reason. The other two cases that Plaintiff cites are even further off point. In *Senne v. Apfel*, the ALJ's decision was vacated because he found that the claimant was not disabled even though he satisfied a Listing – a clear violation of the statutory framework. 198 F.3d 1065, 1067-68 (8th Cir. 1999). Finally, in *Reynolds v. Commissioner of Social Security*, the ALJ discussed whether the claimant's mental disorders satisfied the requirements of Listing 12.00, but never discussed the claimant's back pain in relation to the requirements of the Listings, even though he found it to be severe. 424 F. App'x 411, 415 (6th Cir. 2011).

"Where the record as it exists at the time of the administrative hearing fairly raises the question or is inconclusive as to whether the claimant's impairment meets or equals a Listed Impairment, courts have held that a medical expert should evaluate the issue." *Horne v. Comm'r of Soc. Sec.*, No. 13-00226, 2014 WL 585927, at *6 (W.D. Pa. Feb. 14, 2014) (citing *Maniaci v. Apfel*, 27 F. Supp. 2d 554, 557 (E.D. Pa. 1998); *Diehl v. Barnhart*, 357 F. Supp. 2d 804, 815 (E.D. Pa. 2005); *Lee v. Astrue*, No. 06-5167, 2007 WL 1101281, at *4 (E.D. Pa. Apr. 12, 2007)). "However, an ALJ is not required to obtain an expert opinion as to whether an impairment meets or equals a listing and is fully competent to make an equivalency determination." *Id.* (citing *Cordovi v. Barnhart*, No. 04-3742, 2005 WL 3441222, at *6 (E.D. Pa. Dec. 14, 2005); *Oakes v. Barnhart*, 400 F. Supp. 2d 766, 774–78 (E.D. Pa. 2005)).

The record before the ALJ in this case was thoroughly developed, as Plaintiff's impairments have been laid out at length in the medical documents which she provided to the ALJ for review. That evidence was more than sufficient to demonstrate that Plaintiff did not meet or equal any of the Listed Impairments. Accordingly, the Court concludes that because the record did not fairly raise the question of whether Plaintiff's impairments met or equaled a Listed Impairment, the ALJ did not err by failing to have obtained a medical expert opinion regarding that issue.

Plaintiff also takes issue with the ALJ's decision not to order a consultative exam to assess her mental abilities and limitations. However, the decision whether to order a consultative examination of the Plaintiff is totally within the discretion of the ALJ. *Thompson v. Halter*, 45 F. App'x 146, 149 (3d Cir. 2002); 20 C.F.R. §§ 404.1517, 416.917. An "ALJ's duty to develop the record does not require a consultative examination unless the claimant establishes that such an examination is necessary to enable the ALJ to make the disability decision." *Id.* Conversely,

where, as here, there is a clear basis already present in the record for the ALJ to find there is no severe mental impairment, additional testing is not necessary. *See Rosa v. Colvin,* 956 F. Supp. 2d 617, 623 (E.D. Pa. 2013). Accordingly, Plaintiff's second argument fails.

3. *The ALJ Did Not Err in Failing to Consider Plaintiff's Hearing loss, Obesity, and Pain as "Severe" Impairments at Step 2 of the Sequential Evaluation.*

At step 2 of the sequential evaluation, the ALJ must determine whether a claimant suffers from a severe impairment. If the claimant fails to show that her impairment or combination of impairments are "severe," she is not eligible for disability benefits. *See Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). Step 2 sets the bar quite low. "An impairment or combination of impairments can be found not severe only if the evidence establishes a slight abnormality or a combination of slight abnormalities which have no more than a minimal effect on an individual's ability to work." *Newell*, 347 F.3d at 546 (citation and quotation marks omitted). In the instant matter, the ALJ determined that Plaintiff has the following "severe" impairments: "thyroid cancer, status post thyroid mass removal, degenerative disc disease of the lumbar spine, osteoarthritis of the right knee, post-surgical hypothyroidism, status post right knee meniscus repair, depression, status post closed head injury and history of drug and alcohol abuse." (R. 23). Plaintiff contends that the ALJ erred because she failed to also consider the following alleged impairments as "severe": hearing loss, obesity, and pain. The Court again cannot agree.

With regard to Plaintiff's first claim, there is no evidence that rationally establishes that Plaintiff experienced work-related functional limitations resulting from hearing loss. The only evidence in the record related to this alleged impairment is a medical record from 2001 indicating that Plaintiff suffered from moderately-to-moderately severe hearing loss in her right

ear.[3] (R. 831). Moreover, Plaintiff did not address hearing problems at all during her hearing testimony, even when prompted by the ALJ to discuss if there was anything else that "limit[ed] her ability to do things." (R. 43). Plaintiff replied by speaking only about thyroid issues. Then Plaintiff's attorney questioned her about generally the same issues as the ALJ, without mentioning anything regarding hearing loss. Plaintiff concluded her testimony regarding physical symptoms by being asked, "Do you have any other physical problems?" (R. 50). Plaintiff responded, "No." (R. 50). The transcript from the hearing also reflects that Plaintiff was able to hear all of the ALJ's questions. Not once did she ask for her to repeat anything. Accordingly, this Court finds no reason to overturn the ALJ's determination that her alleged hearing loss was not a "severe" impairment.

Plaintiff also alleges that the ALJ violated S.S.R. 02-1p by not considering her obesity as a "severe" impairment. Under S.S.R. 02-1p, an ALJ is required to consider a claimant's obesity "at various points in the five-step analysis," including at step 2.[4] *Rutherford,* 399 F.3d at 553. However, an ALJ's failure to do so does not automatically require a remand, especially where a claimant has not even cited obesity as a disabling impairment at the administrative level. *Id.* In such case, when an ALJ fails to specifically consider a claimant's obesity in rendering a

---

3.      Plaintiff submitted records to the Appeals Council from Jeffrey B. Banyas, M.D., dated June 19, 2012, which further documented Plaintiff's hearing loss. (R. 7-9). The Appeals Council did not consider this evidence, since it postdated the period adjudicated by the ALJ. (R. 2). Plaintiff has not requested a remand so that the ALJ can consider this evidence, but the Court notes that any attempt to do so would have been futile. *Hanson v. Astrue,* No. 12-84, 2013 WL 1631389, at *9 (W.D. Pa. Apr. 16, 2013) (citations omitted) ("While all of the records submitted to the Appeals Council are 'new' in the sense that they postdate the ALJ's decision, these records are immaterial since they do not relate to the time period for which benefits were denied.").

4.      In *Rutherford*, the Court of Appeals interpreted S.S.R. 00-3p, an earlier version of S.S.R. 02-1p. 399 F.3d at 552 n.4. It noted, however, that the S.S.R. 02-1p is substantively the same as S.S.R. 00-3p, and the analysis is the same under either rule. *Id.*

decision, "remand is not required" unless consideration of the claimant's obesity would have "affect[ed] the outcome of the case." *Id.* (citing *Skarbek v Barnhart*, 390 F.3d 500 (7th Cir. 2004)).

As in *Rutherford*, Plaintiff never cited her obesity as a factor that contributed to her alleged inability to work. Even assuming that the record was sufficient to put the ALJ on notice of Plaintiff's obesity,[5] she has not articulated how consideration of her obesity would have altered the ALJ's analysis at any step of the sequential evaluation, let alone how her obesity was a "severe" impairment. Nor are there any medical records to document the effects of her alleged obesity. In any event, although the ALJ's decision did not reference the word "obese," the restrictions the ALJ adopted in her RFC sufficiently accounted for most of the limitations that could be expected to arise due to obesity. *See* S.S.R. 02-1p, 2002 WL 34686281, at *6 (S.S.A. Sept. 12, 2002) ("An [obese] individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching."). Therefore, the ALJ's failure to explicitly discuss Plaintiff's obesity or consider it a "severe" impairment does not warrant a remand.

Finally, Plaintiff argues that the ALJ erred by not considering the alleged pain caused by mild stenosis in her spine, degenerative disc disease, mild neuroforamen narrowing, osteophytes, and leg problems to be a "severe" impairment. This argument is untenable. Pain is considered a symptom, not an impairment. *Compare* S.S.R. 96-4p, 61 Fed. Reg. 34488 (July 2, 1996) ("A 'symptom' is not a 'medically determinable physical or mental impairment' and no symptom by

---

5.    Plaintiff's body mass index ("BMI") ranged from 26.0 to 35.4. According to the S.S.A., "[f]or adults, both men and women, the Clinical Guidelines describe a BMI of 25-29.9 as 'overweight' and a BMI of 30.0 or above as 'obesity.'" S.S.R. 02-1p, 2002 WL 34686281, at *2 (S.S.A. Sept. 12, 2002).

itself can establish the existence of such an impairment.") *with id.* at 34489 ("An 'impairment' must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques."). Once an ALJ determines that a claimant has a medically determinable impairment that is likely to cause pain – e.g., degenerative disc disease, in Plaintiff's case – she must go on to evaluate the intensity and persistence of the pain along with the other objective medical evidence of record, when deciding whether the impairment is severe and when assessing a claimant's RFC. *Id.*; *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). Thus, Plaintiff's complaints of pain were properly considered later in the sequential evaluation when the ALJ determined Plaintiff's RFC. At that point, "[t]he ALJ has discretion to evaluate the credibility of a claimant and . . . arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged." *Haynes v. Astrue*, No. 10-1049, 2011 WL 2112530, at *4 (W.D. Pa. May 26, 2011) (citations and quotation marks omitted). The ALJ did just that, noting that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but ultimately finding that Plaintiff's statements "concerning the intensity, persistence and limiting effects of these symptoms are not credible." (R. 25). The ALJ did not, therefore, err in failing to find Plaintiff's alleged pain to be a "severe" impairment, in and of itself, or more generally in having considered the effects of Plaintiff's alleged pain in determining her RFC. Regardless, the ALJ's decision to include a sit/stand option in her RFC sufficiently accounted for any functional limitations that might arise from Plaintiff' alleged pain.

4.      *The ALJ Was Not Required to Specify the Frequency that Plaintiff Must Alternate Between Sitting and Standing.*

Plaintiff contends the ALJ committed reversible error in not having defined the frequency that Plaintiff must alternate between sitting and standing. In her RFC assessment and

hypothetical to the VE, the ALJ determined that Plaintiff needed to be able to alternate between sitting and standing at will throughout the workday. According to Plaintiff, that was insufficient because S.S.R. 96-9P requires that "the RFC assessment must be specific as to the frequency of the individuals need to alternate sitting and standing." S.S.R. 96-9P, 1996 WL 374185, at *7 (S.S.A. July 2, 1996). The Court does not agree.

Courts have "held that similar limitations to the RFC in this case have satisfied the specificity requirement in Ruling 96-9P," even though they failed to specifically delineate the exact amount of time a claimant would need to switch between sitting and standing. *McGinnis v. Comm'r of Soc. Sec.*, No. 12–1395, 2013 WL 6710344, at *10 (W.D. Pa. Dec. 18, 2013) (citing *Ketelboeter v. Astrue*, 550 F.3d 620, 626 (7th Cir. 2008); *Hodge v. Barnhart*, 76 F. App'x. 797, 800 (9th Cir. 2003)). If anything, allowing Plaintiff to change positions "at will" provided Plaintiff with "broad flexibility and thus has a more restrictive effect on the jobs available to [her] than the limitation [she] thinks the ALJ should have described." *Ketelboeter*, 550 F.3d at 626.[6]

### 5. *The ALJ's Hypothetical Question Properly Incorporated All of Plaintiff's Credibly Established Impairments.*

Relying on *Podedworny v. Harris*, 745 F.2d 210 (3d Cir. 1984), Plaintiff next contends that the case should be remanded because the hypothetical question the ALJ posed to the VE failed to include "all of her impairments."[7] This argument is without merit.

---

6.     Assuming that the ALJ's alleged failure to define a sit/stand period constitutes an error, any such error was harmless because the VE testified that his conclusion would be the same even if Plaintiff needed to alternate between sitting and standing every 10 minutes, followed by a three-to-four minute period of standing. *See Cruz v. Astrue*, No. 09–0508, 2010 WL 3809829, at *9 (E.D. Pa. Sept. 28, 2010).

7.     This is effectively an "attack[] on the RFC assessment itself" since Plaintiff is arguing that the "ALJ failed to recognize credibly established limitations during the RFC assessment and so did not convey those limitations to the vocational expert." *Rutherford*, 399 F.3d at 554 n.8.

The Court of Appeals has cautioned that the portion of *Podedworny* on which Plaintiff relies "should not be misunderstood." *Rutherford*, 399 F.3d at 554. Notwithstanding the decision's seemingly strong language, an ALJ is not required to submit a hypothetical to the VE encompassing "every impairment *alleged* by a claimant." *Id.* (emphasis in original). Rather, "references to all impairments encompass only those that are medically established. And that in turn means that the ALJ must accurately convey to the vocational expert all of a claimant's *credibly established limitations*." *Id.* (citing *Plummer*, 186 F.3d at 431) (emphasis in original). The Court of Appeals has set forth clear guidance as to when a limitation is credibly established:

> Limitations that are medically supported and otherwise uncontroverted in the record, but that are not included in the hypothetical question posed to the expert, preclude reliance on the expert's response. Relatedly, the ALJ may not substitute his or her own expertise to refute such record evidence. Limitations that are medically supported but are also contradicted by other evidence in the record may or may not be found credible – the ALJ can choose to credit portions of the existing evidence but cannot reject evidence for no reason or for the wrong reason. Finally, limitations that are asserted by the claimant but that lack objective medical support may possibly be considered nonetheless credible. In that respect the ALJ can reject such a limitation if there is conflicting evidence in the record, but should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no objective medical evidence to support it.

*Id.* at 554 (citations and quotation marks omitted).

Plaintiff identifies several impairments that the ALJ allegedly improperly disregarded in the hypothetical which she he submitted to the VE: the side effects of her medications and treatment, fatigue, obesity, her inability to carry things because of numbness in her hands, her hearing loss, and her pain. The Court has already concluded that the ALJ did not err in addressing Plaintiff's obesity, hearing loss, and subjective complaints of pain. Insofar as the ALJ determined that these impairments were not credibly established, she did not have to include them in the hypothetical she posed to the VE. The same is true with regard to the other

limitations Plaintiff has identified.

First, Plaintiff has not identified any medical evidence suggesting that the purported side effects from her medication and treatment resulted in "serious functional limitations." *Burns v. Barnhart*, 312 F.3d 113, 131 (3d Cir. 2002). Plaintiff did testify, upon questioning from her attorney, that "sometimes the Synthroid" renders her unable to concentrate and makes her feel as though she is under water. (R. 48). However, on direct examination from the ALJ, she testified, "[a] lot of times if my thyroid level is off, they call it, it's just where your level is off, you feel like you're under water. You can't concentrate." (R. 44). So when she was supposedly describing the side effects of her medication, she appears to have actually been describing the effects of her hypothyroidism, generally – an impairment that the ALJ certainly took into consideration in crafting her RFC assessment. In any event, since the ALJ's RFC assessment limited Plaintiff to jobs involving "simple, routine, repetitive tasks that do not require fast-paced production requirements," (R. 24), it sufficiently accommodated the side effects allegedly caused by her medication.

Second, although the ALJ expressly noted that Plaintiff complained of fatigue, she found that Plaintiff's statements regarding "the intensity, persistence and limiting effects" of this symptom, along with Plaintiff's other alleged symptoms, were not credible. (R. 26). As was the case with the ALJ's analysis of Plaintiff's subjective complaints of pain, the ALJ's decision in this respect was supported by substantial evidence. None of Plaintiff's physicians documented serious complaints of fatigue. The only evidence to support this point is Plaintiff's own testimony, and even that does not fully support her argument that her fatigue precluded her from working. In response to questioning from her attorney, she defined "fatigue" as feeling "[j]umpy, nervous." (R. 47). And although she testified that she only slept two hours a night, she did not

require naps during the day to make up for her alleged lack of sleep. (R. 48). In sum, the ALJ did not err in failing to incorporate fatigue into her RFC.

Third, the ALJ expressly acknowledged that Plaintiff experienced numbness in her hands, but decided not to credit Plaintiff's testimony about the debilitating effects of this symptom. This credibility judgment will not be disturbed. Even if the ALJ had credited this testimony, the outcome would have been the same. When the ALJ asked the VE if his response to the hypothetical would change if the hypothetical individual was restricted to gross manipulation and fine manipulation, on account of numbness in her hands, the VE testified that the individual could still perform sedentary guard jobs, of which there are more than 50,000 in the national economy. (R. 54-55). Courts have "held that a relatively small number of positions, as low as 1,400 jobs, can qualify as significant." *Lawrence v. Astrue*, 337 F. App'x 579, 586 (7th Cir. 2009) (citing *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993)). Accordingly, assuming that the ALJ erred in addressing Plaintiff's complaints of numbness, the error was harmless, and remand is not necessary.

6. *The ALJ Properly Relied On the VE's In Determining Whether Jobs Are Available For Persons Requiring A Sit-Stand Option.*

Lastly, Plaintiff contends "the ALJ erroneously relied on the Vocational Expert testifying about the number of jobs available with sit/stand options, since the Dictionary of Occupational Titles does not address any sit/stand options." Pl.'s Br. In Supp. of Mot. for Summ. J. at 30 (ECF No. 14). Plaintiff's four-sentence "argument," however, never explains why it was an error for the ALJ to rely on the vocational expert's testimony. Nor can the Court make any such determination on its own. In fact, Plaintiff seems to ignore that in situations where an ALJ must decide whether a claimant can still work despite her need for a sit/stand accommodation, the S.S.A. instructs that "it may be especially useful to" consult with a vocational expert,

notwithstanding the fact that the DOT does not address the sit/stand option. S.S.R. 96-9P, WL 374185, at *7. Insofar as Plaintiff is insinuating that the VE's testimony is somehow unreliable because it is in conflict with the DOT, which says nothing about sit/stand options, this argument fails:

> contrary to Plaintiff's arguments, the information [provided by Dr. Cohen] and DOT in no way conflict. As a vocational expert, [Dr. Cohen] was qualified based on her education, training and experience to opine about the employment market. Plaintiff never contested these qualifications. Further, SSR 00-4P does not limit a vocational expert's opinion solely to DOT. The explanation provided by [the expert] regarding the availability of the sit/stand/walk option is therefore reasonable and the ALJ did not err by relying on it.

*Cathcart v. Astrue*, No. 08-00266, 2010 WL 1054049, at *17 (W.D. Pa. Mar. 22, 2010). The Court is persuaded by such reasoning, and finds that Plaintiff's argument with regard to the VE's testimony has no merit.

**IV. Conclusion**

It is undeniable that Plaintiff has a number of impairments, and this Court is sympathetic and aware of the challenges which Plaintiff faces in seeking gainful employment. Under the applicable standards of review and the current state of the record, however, the Court must defer to the reasonable findings of the ALJ and her conclusion that Plaintiff is not disabled within the meaning of the Social Security Act, and that she is able to perform a wide range of work present in significant numbers in the national economy.

For these reasons, the Court will **GRANT** the Motion for Summary Judgment filed by the Commissioner and **DENY** the Motion for Summary Judgment filed by Plaintiff. An appropriate Order follows.

McVerry, J.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**CAROL ANN SWARROW**,                )
                    **Plaintiff,**      )
                                        )
**v.**                                  )   **2:13-cv-01060**
                                        )
**CAROLYN W. COLVIN**,                  )
ACTING COMMISSIONER OF                  )
SOCIAL SECURITY,                        )
                    **Defendant.**      )

## ORDER

    **AND NOW**, this 14th day of July, 2014, in accordance with the foregoing Memorandum

Opinion, it is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that Plaintiff's Motion for

Summary Judgment (ECF No. 13) is **DENIED** and Defendant's Motion for Summary Judgment

(ECF No. 11) is **GRANTED**. The clerk shall docket this case **CLOSED**.

                                            BY THE COURT:

                                            s/ Terrence F. McVerry
                                            United States District Judge

cc:    Suzzanne J. Hayden, Esq.
        Email: suzannehaydenesq@verizon.net

        Christy Wiegand
        Email: christy.wiegand@usdoj.gov